and before his time starts, I do want to thank Judge Ludington for his assistance in this case. He's obviously with us by phone. Go ahead. Thank you, Your Honor. Ben Glassman on behalf of the United States. I'd like to reserve five minutes for rebuttal. The non-custodial sentence that the district court gave Richard Bistline on remand from this court's decision is substantively unreasonable, largely for the reasons that this court has already explained. We've set forth our position in the briefs. I'd like to call attention, highlight a couple of points and try to answer whichever questions the court has. There is no way that this non-custodial sentence could reasonably further the statutory interest in the sentence reflecting the seriousness of the offense. It's not enough for a defendant to himself say, I recognize the seriousness of the offense. That's not the sentence. It's not enough for a district court simply to say this offense is serious and then give a sentence that does not reasonably reflect the seriousness of the offense. Really, the only way that a non-custodial sentence could reflect the seriousness of an offense in this case is if you take the view that really Bistline barely committed a crime at all. If you think that these child pornography images and videos were acquired by an automatic downloading program that did all the work itself without Bistline's involvement, that's essentially what the district court said on remand, which is very similar to what it said at the original sentencing. The district court in this case also added that it hadn't seen any videos of rape of girls and more importantly from the government's perspective, even if it had, that wouldn't change the sentence. So the district court was relatively explicit that the nature of the crime, the child pornography that was acquired by Bistline was not relevant to its selection of the sentence. So from the government's perspective, this non-custodial sentence cannot reasonably reflect the seriousness of the offense. Tell me this, do you think we can mandate that the district court impose a term of imprisonment? Well, I think that this court can look at this sentence, which does not include a term of imprisonment and say that there's no way that it reflects the sentence. Is that just sort of a euphemistic way of saying you've got to impose a sentence, District Judge? Yes. Do we have authority to do that? The court does not have authority to select a sentence itself. There's certainly a big difference between this court picking a particular sentence versus reviewing a sentence that's before it and saying this one just doesn't pass muster and is not even close. The court certainly can say the latter. In the first time. I mean, we can reject sentences and say that a particular sentence does not reflect the balance prescribed by 3553A. Correct. But we couldn't then say, all right, on remand, impose a sentence of 24 months or something. Exactly. And the United States does not ask the court to do that. The United States simply asked the court to say that the mistake by the Supreme Court has said. You know, Mr. Glassman, I'm looking at defendants' reply to government's re-sentencing memorandum. And in that, they cite 44 cases where a court has imposed a sentence of either zero or one debt. Apparently, judges have done that. And in these, I gather these are all child pornography cases. So why shouldn't this be one added to that list there? Are all these unreasonable? Substantively unreasonable? No, Your Honor. And I think that the, not necessarily, I don't know. I don't know the facts of all of those cases. But I think that to say that there have been 44 cases, I don't know how that list was compiled. They're not all reported decisions. Some are just CMECF citations to district courts that 44 cases in history ever by any court have imposed a probationary sentence really tells us nothing about whether this probationary sentence on these facts is reasonable. I mean, it's just so much of, too much of an easy game to play. I can easily find cases from this court where this court has affirmed prison sentences for defendants who are older than this defendant, in worse health than this defendant. Have you cited any such cases? No, but I'm happy to provide them. I didn't see that you did. No, because I don't think that's the right inquiry. That's not the right inquiry at all. I mean, let me come at this a slightly different way. I think this goes to the issue of whether the sentence creates unwarranted sentence disparities, which, by the way, the district court acknowledged it does create sentence disparities. But I took a closer look at the statistics that were submitted by the defendant on remand that the district court did not allow into evidence. Now, the government for, in effect, keeping that evidence out and then saying that there was not sufficient evidence about what is relevant. In other words, a defendant who has similar characteristics in terms of offense and offender to this defendant. Well, as an initial matter, I don't think there's anything wrong with not talking about evidence that the district court specifically excluded from the record. But I did take another look at that evidence anyway. And if you look at it, and you look at Appendix 1, the number, and you look at the percentage of defendants in the 6th Circuit in fiscal year 2011, which is what they submitted, who were not sentenced to any prison, that was three people out of 146. So in other words, 97.9% of all defendants, according to their statistics, were sent to prison for some period of time. And I took a further look and said, well, wait a minute. Maybe they're counting among that prison the people who got like a day in the courthouse lockup, like this line. Okay, well, we add in then the next category of their sentences, which is zero to six months. That's another four people total. So that's seven out of 146. So in other words, 95% plus received a prison term of over six months. Now, those are their own statistics. In fact, if you look at your more specific statistic of the number of defendants in the 6th Circuit in fiscal year 2011, who had the same total offense level as Bisline, 26, the number of defendants who received no term of imprisonment is zero, according to their own statistics. How many of those, I mean, you know, it seemed to me that Judge Graham basically decided on a noncustodial sentence primarily because of Bisline's age and ill health. Yes. Now, most people who are in their late 60s like him don't commit crimes. Exactly. All right. But so, is there any, if you got in the statistics, I want to know about old people who commit crimes. Do they get sentenced to prison for long terms or do they get off on probation most of the time? Well unfortunately, I'm unaware of any available statistics that would address that precise question. Again, that's my problem. I mean, so maybe under Section 3553A, that's a reasonable factor to take into account. That in the universe of old people who commit possession crimes like this, where there's no direct harm to a minor, maybe that's not unreasonable. Two responses to that. First, in order for the sentence to be reasonable, it can't simply be because there are other old people who may or may not have been sent to prison. I have no idea about those other cases. Perhaps if there are such cases, which I don't know, their sentences were too short. I don't know. Only Bisline's cases before this court. But for a sentence to be reasonable, it cannot be reasonable only because with reference to some other subset of cases. It has to be reasonable with reference to the 3553A factors. So you've got to be able to articulate a reason that that sentence for someone who is older or in ill health reasonably furthers those statutory purposes of sentencing. Now there is a way, I think, I'm happy to concede it, I guess to the extent it's implicit in your question, that perhaps the need to incapacitate this defendant is less based on his age and health. But no one's ever said that the court couldn't take into account age and health. And maybe it is relevant to incapacitation. But it can't possibly reflect the seriousness of the offense or deter others. Imagine that you are a 67-year-old man who's bored and maybe I'll download some child pornography. If you knew that if you downloaded child pornography over a lengthy period of time, and you got caught eventually, and you got convicted, that the worst that would happen to you is a term of supervised release where you'd be sentenced for, what possible disincentive is that for you? That couldn't possibly deter anyone. And I want to point out that, to tie this into deterrence, that the district court literally did not give any explanation as to how this noncustodial sentence could further deterrence. It simply asserted that an informed person would think that it was sufficient. That is not an explanation at all. This line's attempt to fill in the gap by saying, hey, deterrence is not empirically relevant to sentencing, that won't fly because the statute says that it is. And the statute is fine. You have the government acknowledges that the court would certainly have been appropriate to vary below the guideline range here, right? Indeed, the government recommended a sentence slightly below the guideline range on remand in order to account for the defendant's age and health. You just don't like a variance down to zero. That's, if I may answer the question, Your Honor, that's actually a pretty important point. It's not a matter of not liking a variance down to zero or disagreeing with a particular sentence. It is a very different thing to say that some variance might be appropriate based on any number of reasons versus saying that a variance of this magnitude would be appropriate so that if you cite a bunch of cases where there have been downward variances, for example, in child pornography possession cases, without showing that those downward variances went to zero, you're not showing anything. So I will reserve the rest of my time. Sure. Mr. Tyak? Thank you, Your Honor. May I please report to Mr. Tyak on behalf of Richard Beislein? Real simply, the court, I think, went to great lengths to evaluate all of the factors here. The court went to great lengths to discuss its explanation. I know the transcript is pretty in-depth. I recall Judge Graham speaking into the record for approximately an hour. It took him about an hour to articulate his rationale. And at the end of the day, Judge Graham considered the mandate from this court. Judge Graham considered new evidence, new information. Judge Graham took the extraordinary step of contacting the Sentencing Commission himself. Judge Graham had the opportunity to observe and interact with Mr. Beislein, not just at the first sentencing, but at the more recent sentencing. And in the end, Judge Graham considered all the factors. He considered all the evidence. He considered all the arguments of counsel. He weighed the factors. He didn't mention a single line from our opinion. I'm not sure how to interpret your question. In other words, you know, I mean, we had a pretty lengthy and I would say comprehensive opinion. Agree or not? I agree. I mean, agree with the opinion or not. Oh, right. And it was rejecting a sentence in many respects identical to the one that comes back to us now. And one would think that in considering whether to impose the sentence before us now, that the court might speak more about this opinion, for example, than the one we expressly distinguished in Stahl. It's a remarkable omission. And I guess the challenge that I think you face is how to reconcile the court's decision with ours. Because, I mean, the way it works is the district court has to comply with our decision. We don't have to comply with his. I think the district court has done that. But I think what the district court also did, which it was entitled to do and perhaps required to do, was it considered the changes that had occurred in the three years in between. In between the time of the first sentencing and the time of the resentencing, Mr. Beislein had completed one year of sex offender counseling very successfully. Mr. Beislein provided an allocution that I think reflected the insight that he gained through the counseling. Mr. Beislein passed a polygraph examination where he denied any improper contact with children or any desire to have any improper contact with children, and he passed that polygraph examination. Mr. Beislein was completely compliant with his probation officer and otherwise complied with all the rules of probation. Mr. Beislein also had another heart attack. Mr. Beislein was three years older. Mr. Beislein's wife had been re-diagnosed with a new form of cancer. And Mr. Beislein also provided additional evidence relating to how the program ended up on his computer, provided additional evidence relating to prison and all these other things. And then, even with all that additional evidence, and you may know from the transcript, I advocated to the court, essentially judge, given all the new evidence, I think you can impose this same sentence with nine months of home confinement, which he had already served. The judge disagreed with that and imposed what courts have recognized as a substantial penalty. Home confinement is a penalty. It is punishment. It may not be this court's preference, but it is punishment. It is an additional further punishment that he received, and he received three years of home confinement. In all candor, I was quite disappointed with that. But, nevertheless, it was within Judge Graham's discretion. How did he address the concept of general deterrence? The general deterrence question was addressed, well, first of all, with specific deterrence. I think everyone agrees Mr. Beislein is not really at risk to re-offend. The general deterrence question, as Mr. Glassman stated, Judge Graham addressed by simply saying, anybody who is informed about the facts of this case would understand that this is a punishment that would deter people like this. So if you had a 70-year-old man with a pacemaker and a defibrillator, you had a 70-year-old man who had trouble walking, trouble hearing, trouble speaking because of the two strokes that he suffered, that type of person would be deterred by this sentence. And I think you're ending up in a situation where you have to view general deterrence through the prism of similarly situated people. Let me just interject, if I may. On that point, Mr. Beislein has said himself that he was already largely self-confined to his home. Doesn't that undermine the idea that if we're looking at a similarly situated body that they would be deterred? I mean, it's not much of a change. Well, to say he's self-confined, I mean, he's 70 years old with health problems. His wife has health problems. I mean, there is a common sense quotient here that tells you Mr. Beislein wasn't going out on Saturday nights and cruising up and down Main Street. But the point is, is that his liberty has been impinged. His liberty has been affected by the home confinement. He's not allowed to leave without permission from the probation department. He's not allowed to leave unless for specific limited purposes. It's not enjoyable, but, again, my point is that relative to other defendants who aren't spending most of their time at home, this would seem to be less of a deterrent for a defendant or a body of potential defendants who do spend most of their time. Sort of like Burr Rabbit. Don't throw me into the briar patch. This is exactly where he wants to go. And I guess to answer your question to both of your honors, I guess the issue is that certainly if you equate deterrence with severity of punishment, then I must concede that the lesser the punishment, the lesser the deterrent effect. But I think what the court's getting at, and I think what the point we would make, is that Judge Graham acknowledged as well that there is a market out there that isn't affected by any individual actor. This is a unique situation. A lot of the general deterrence theories, especially in this area, relate to the market theory that there's a demand or that the market is being furthered or isn't being deterred by these kind of punishments. The market's going to go on regardless. And I guess what the court's ultimately getting at is perhaps... Well, the case law doesn't really accept that rationale. That a particular defendant's downloading of child pornography is just simply not going to have an effect. I mean, I think the case law says otherwise, the opposite. Well, and I guess the ultimate question is that from the court's questioning, it seems that this court may disagree with the amount of weight that Judge Graham put on that 3553 factor. I'm sorry, which factor are we talking about? The deterrence, the deterrent factor. Well, it doesn't... I mean, the first time he was straight up and said zero. This time he, in a very conclusory fashion, says it satisfies that. You know, it says, well, it's not terribly persuasive when somebody's conclusory is a general matter. And I think the other thing that's changed a lot, Your Honor, since the last sentencing is that there's been some changes from the Sentencing Commission as well. The Sentencing Commission, and all these factors are related. It's hard to just take one factor in isolation. You have to consider all these factors together. And at the end of the day, the policy statements have been changed to include age and health as a permissible consideration. You know, on that point, if I may just interject again, as I understand, I mean, I know that there was some criticism in the rehearing papers that, you know, we were oblivious to the change. To 2H, are we talking about? 2H1? 5H1.1. I'm sorry, 5H1.4. And, you know, that change was made a year after Mr. Beislein was sentenced. The original sentence. Okay. And as I understand the statute, 37, well, 3742-something. Maybe you gentlemen know better than I do. I don't know it either, but I know what you're talking about. Yeah, I mean, it says that even when there is an amendment, the version in place at the time of the original sentencing, even on a remand, is the governing one. I don't think there's a huge difference between these. I mean, one says it in a negative way. We discourage this factor. The other says you can consider the factor only upon a very high showing. But I guess I just want to clear up that technical point. And I guess in the end. I mean, that doesn't seem like a big development. Yeah, and it's a departure standard as well. And Judge Graham, I asked for a departure, and Judge Graham says I'm not doing a departure. We're just going to consider all of that under 3553, which I think is also appropriate. So, again, those are more policy statements that relate perhaps to a departure, and departures are kind of going the way of the dodo bird these days. I mean, I don't think courts spend their time worrying about that. Isn't it clear from what Judge Graham said that the only reason your man was not given a prison term by him was because of his age and health? I'm not sure that I would characterize it as the only. Well, let me read you. Now, if Mr. Bisline were a young person with no health problems, he would be going to prison. I'm reading from Judge Graham. He also says the reason why the court has not imposed a sentence of incarceration in this case is based upon Mr. Bisline's age and his health. It's pretty clear. Judge Graham did say that, and at the end of the sentencing hearing, I also specifically clarified with the judge. Yeah, I know. You tried to salvage that. Well, because there had been a lot of post-sentencing rehabilitation. There had been. All right, but I'm saying that based on just what he said, that's the only reason your client's not in prison. Now, is that enough? Is that substantively reasonable that if you're old enough and ill enough that you get a free pass to download child porn? Well, the simple answer to that is no. You don't get a free pass because you're of a certain age. And obviously you don't get a free pass just because you have certain health concerns. But again, you have to consider all of the different factors. And when we're talking about the seriousness of the offense, we have a situation where things were downloaded so they could be viewed. He didn't copy them. He didn't actively distribute them. He did not pay for them. He did not trade them. He did not make copies and put them on a shelf. He had a number of files and a number of images that were not even involving sexual conduct in the first place. They were people in suggestive poses. Right, but we know he committed the crime because he pled guilty to it. But as Judge Graham stated, the guidelines don't provide a lot of guidance to district courts in the different levels of culpability in today's day and age. And the report from the Sentencing Commission seems to address that as well and acknowledge that. So at the end of the day, if you go back to the original guidelines, back to 1991 when the original guidelines on this were put into place, the guideline recommendation would have been six to 12 months. Judge Graham obviously didn't give six to 12 months of imprisonment. He gave three years of home confinement. But at the end of the day, the other important thing that has happened since the time of the first sentencing is that the Sentencing Commission has recognized some of the flaws in the guidelines. And this court was particularly critical of Judge Graham from the first sentencing because Judge Graham commented extensively about the fact that this guideline had been created by Congress. And therefore, under Kimbrough, he felt that he had to give it less deference. This court told Judge Graham he had that wrong. Judge Graham did not rely on that factor in this sentencing hearing. Instead, he pointed out some of the very specific problems with the guideline. He pointed out that most courts, the tune of 70 or 80 percent of them, are sentencing people below guidelines. And I appreciate those points, but if I can just speak to this guideline issue generally. I mean, I think that we need to get more specific in our terms here. Judge Graham, as I read his comments from the second sentencing, is criticizing a number of the enhancements, largely on grounds that they're common to most defendants. I think those grounds are ones that are also cited by the commission in its report, and as you, in your excellent brief, point out. But a lot of the congressional involvement here concerns the base offense level, and at least three times since, I think, 94, and maybe more. It's hard to keep track of all this. Congress has enacted, through its bicameral and presentation requirements under the Constitution, has enacted directives to the commission to increase the base offense level. And in our first opinion, and so these are a different animal. I mean, those are different than the enhancements that Judge Graham criticized. And in our first opinion, and I'll read from it, we said, it is Congress's prerogative to dictate sentencing enhancements based upon a retributive judgment that certain crimes are reprehensible and warrant serious punishment as a result. Then we said, Congress's long and repeated involvement in raising the offense levels for 2G2.2 makes clear that the grounds of its action were not only empirical, but retributive, that they included not only deterrence, but punishment. And so I see Judge Graham, and I see in your brief, the criticisms of the enhancements based on these empirical grounds. But what I'd like you to answer is the question, Congress, according to what I just read, Congress made a value judgment, a retributive value judgment about this offense, and said this is serious, and we want serious punishments for this. The court did not take on that value judgment. It did not challenge that value judgment. And so where in this entire record of the second hearing, where do we find any recognition of the retributive value judgment that Congress made and that we called out in the first opinion in this case? Judge Graham discusses at length enhancements, as you point out. And he discusses the fact that the guidelines recommend a certain sentence. When you get into the decision as a district court judge or perhaps as a court of appeals judge in reviewing a sentencing decision, one of the things that everybody has reminded this court to look at is the variance. How big is the variance? Where do we start from the variance? And one of the things the government likes to point out is that we get from 63 to 78 months all the way down to zero. Well, if you take these enhancements and you sort of critique them and you have a policy judgment where you disagree with them or whatever, it might get you down to a certain point. I haven't done the math. Thirty to 37 months. Okay, so we get down to 30 to 30. Thank you, Your Honor. I'll take the court's analysis of that. Thirty to 37 months. Now all of a sudden, to get to zero, the variance isn't quite so steep. And so you look at the guideline. It's still 100 percent. Well, it's three years of home confinement. It's essentially right in the guideline range, but it's home confinement. Guidelines are talking about imprisonment. I mean, all of us know that any defendant would leap at the chance at home confinement versus being sent to a federal penitentiary. But I guess my point is, so then you end up with a guideline recommendation. Again, the defense has argued that the guideline recommendation that should be considered under 3553 for policy reasons should be the 6 to 12 months. The government's arguing it should be 63 to 78 months. You're posing a scenario where, okay, we get rid of the enhancements. That's all the court spoke to. Yeah, the 30 to 37 months. And so at the end of the day, then the question becomes, considering all of the 3553 factors, considering the guidelines as just one of those factors, did the court not give proper weight to the guidelines? Well, and on that point, the court never mentioned the range. I mean, in our opinion, we say the actual range is the starting point. And I think if we give a generous reading to his comments, we could say, well, he's disagreeing with the enhancements on policy grounds, and he's doing so for reasons that are themselves reasonable. But he still has to come up with some range that is the starting point. It's not a reason for throwing everything out and just freewheeling it and not taking the range into account as a factor, as you just said. I don't see it anywhere. Well, I think he did. He didn't set forth the range because the range wasn't really in dispute coming back from remand. There was never any objections to the calculated range. There's no whiff of the range making a difference to Judge Graham. That's my concern. And I just want to be really candid with you about my concerns and let you speak to them. No, I guess at the end of the day, the range, again, is one factor to be considered. It's a factor that Judge Graham disagreed with on policy grounds. I think he has the right to do that. And at the end of the day, he considered all the factors. He weighed all of the factors. He discussed not just in 2013 but in 2010 his policy disagreements with the guidelines. And in the end, and I'll summarize with this, Mr. Beislein is the exception. He's not the rule. He's the exception. And Congress allows there to be exceptions. There is no mandatory prison sentence here. Congress, notwithstanding its role in creating the guidelines, Your Honor, never made a mandatory prison sentence here. That means Congress envisioned some people, maybe a few, maybe seven out of however many hundreds or whatever the numbers are. But the point is there are exceptions, and Judge Graham in his discretion found Mr. Beislein to be the exception. Well, I mean, he focused very much on age and illness, as I think Judge Gilman pointed out. But one could argue that there are other factors that were just not weighted in a serious way at all, beyond lip service, frankly. Seriousness of the offense. I mean, again, he makes comments suggesting it's not serious. I mean, the crime here was you referenced how this program got on his computer. The crime was not down putting lime wire. It was not his son who committed the crime. He committed the crime. And moreover, he committed the crime over the course of an entire year. If this was one intoxicated afternoon, and, you know, then maybe you start to, you know, get some real traction here. But this is over the course of a year, and he is the one typing in PTHC. He's the one who did it. Right. No doubt about that. The court to this day does not seem to face that fact. It's always the passive tense. Was downloaded, et cetera. And I'll just let you, I mean, why am I misreading the court's sense of the seriousness of the offense? Well, the impression I have is that Judge Graham has seen much worse. I think that's what he said. He says he's seen much worse. It doesn't matter. Much worse in the form of content. Much worse in the form of the quantity. Much worse in the form of the conduct of the defendant. Much worse in terms of computer sophistication. But what does that have to do with it? Who cares? That all makes to the conduct of the offense. But, I mean, but again, he chose to download this stuff. You don't have to be a computer savant to know that it's a really bad thing to look at pictures of Kylie being raped by her father. That takes moral sense, not computer sense. So why does this lack of sophistication matter? The computer didn't do it. He did. Isn't that fair? The crime was committed. There's no doubt about that. He committed it. He committed it. Right. Let's go back to voice. Nobody from our side of the case has suggested that the crime happened to Mr. Bison. And I'm not putting that on you, Mr. Tyak. And I would say your representation in this case has been superb. And every defendant should be so lucky to have somebody who's working as hard for their client. But my concern is with the district court. I mean, the district court is the one who keeps saying these things. When I read the second hearing transcript for the second sentencing about this sophistication issue, for a moment I wasn't sure if I was reading the transcript from the first sentencing or the second one. I mean, that's what he said. And at the end of the day, we're reviewing his decision, not anything you've done. How do you get around that? I think the important distinction there is context. It's context. You're looking at Mr. Bison's conduct in the context of the law, no doubt. He's on the wrong side of the law. That's what we do. Yeah, I know. He's on the wrong side of the law. He violated the law. He committed a crime. Judge Graham's context wasn't looking at it in the context of guilt or innocence. He was guilty. There's no doubt about that. Judge Graham's looking at it in the context of the overall world of child pornography offenders. And Judge Graham's seen a lot of them. Judge Graham's seen I don't know how many, but over the last 20-some years he's seen a lot of them. And what he made very clear is that in his experience he has seen a lot worse and that he wouldn't characterize Mr. Bison's conduct in this case as being on the more serious end of the spectrum because of his lack of sophistication, because of the limited number of images and videos, because of the nature of a lot of the images and videos. Again, not to say that they weren't illegal or that they weren't repulsive, but Judge Graham is putting Mr. Bison's conduct into the context of what he's seen over almost three decades as being a sitting federal trial judge. That's what we want our trial judges to do. We want our trial judges to put them in context, and this court unfortunately doesn't have the benefit of Judge Graham's context. It doesn't have the benefit. And perhaps Judge Graham didn't do an eloquent enough job of explaining all that, but in the end he made it very clear that Mr. Bison's conduct was not the worst that he's ever seen. In fact, he's seen a lot worse, and I think that it's a function of him being able to put Mr. Bison's conduct into a context of all of the offenders that he's seen over the years and recognizing that this man wasn't buying it, he wasn't selling it, he wasn't trading it, he wasn't making it, he wasn't copying it over onto disks or videotapes. Didn't he get an enhancement, I mean agree to an enhancement for distribution? I might be misremembering. That's true. And that's the way LimeWire works. Maybe that's where sophistication comes in. It's passive distribution, meaning to view it, the way the program works is if you go back to your computer in your office right now and you want to see a story about something going on in Syria, you'll click on it, and you'll watch a small video from CNN.com and it'll leave a temporary internet file on your computer. LimeWire and these programs work the same way. You can't view it, you can't observe the content unless or until it's downloaded, and I think the record shows all that. The testimony of the FBI agent, Agent White, at the first sentencing talked about that. Just one small question and then I'll get out of the way here. Is there any support in the record for the district court's comments in this sentencing hearing about this automatic downloading that he seemed to think would be happening of these images? Automatic downloading, again, what Judge Graham was talking about is, again, how the program works and what Agent White testified to at the very first hearing, as I recall, I haven't read it recently, but as I recall, is that he talked about how you cannot view the files unless or until you download them. So what happens is a list comes up, you click on one of the files, and it may take a minute or two, it may take longer than that, but eventually you can watch it, but it has to be downloaded and it's automatically placed in a shared file by the program. But all the user has to do is run the search, again, PTHC, whatever it may be. A list comes up. When the list comes up, you haven't downloaded the files at that point. So what you do is you click on it to watch it, you click on it to observe what the file is. It cannot be observed, it cannot be watched without first being downloaded into your shared file. But, I mean, that sounds like a refutation of the court's comments, that he said, you know, there was this automatic downloading, and I don't know where that comes from. Well, automatic downloading, it is automatically downloaded to your computer when you view it. In other words, Mr. Breisland... Right, but you have to choose to view it. You have to choose to view it. It's not just HAL and 2001 Space Odyssey taking over. You have to choose to view it, but you can be viewing it without a conscious thought that I'm going to save this for later viewing. There's no evidence that Mr. Breisland reaccessed these files. There's no evidence that Mr. Breisland went back and looked at them a second time. There's no evidence that Mr. Breisland ever moved them around, recategorized them, put them in little folders on his computer in other places. We see that in other cases. We see, you know, my favorites over here. We see young children here, teenagers here. We see people moving the files around. The only place that these files were ever found were in the shared folder on his computer. They were placed there automatically by the program when Mr. Breisland chose to view it. So, again, we may be splitting hairs here, but at the end of the day... Okay, no, I understand you. I think Judge Graham understood that. Again, he may not have articulated it well, but the point is what Mr. Breisland wasn't doing was categorizing and cataloging and storing for later use. He was watching one time. It would be downloaded on his computer because it had to be for him to watch it. At the end of the day, that's what he was doing. My time has been up for a while, unless the court has further questions. Judge Ludington, we're sorry to crowd you out, perhaps. Do you have any questions? No, I do not. I appreciate the argument. Judge Gilman? All right. Thank you again for your arguments. We'll hear from Mr. Glassman. Just a few quick points, Your Honor. I don't think that the district court was saying in context, I've seen... Well, he did say at one point, I've seen a lot worse, but then he also said at the close of the sentencing hearing that he didn't see rape and he didn't care. If it was on there, it wouldn't change his sentence. So I don't think that that's really a reason for the variance. To get to the 30 to 37-month range, that would be eliminating the two points for use of a computer and it would be eliminating any enhancement for the number of images. As I got to the range, if you just use the minimum number for number of images, so adding two points because it was more than 10 images, then you're looking at 37 to 46 months. And, of course, it is a big difference, as I tried to say in the opening argument, between articulating a legitimate policy disagreement with particular guidelines and actually working out what that means for the sentence. But Judge Graham, I thought, made some reasonable points about, look, the enhancements for computer use, enhancements for number of images, those may have meant something in days where people had glossy photographs. But in this day and age, you get... And multiple images are easy with the click of a mouse. So to have enhancements for that, he thought, was unreasonable. And that's fair. Sure, so get rid of those enhancements. Now, how does a non-custodial sentence, for the purposes of sentencing the government submits, it does not... Right, well, that's your big point. Yes, that's the big point. So with respect to deterrence, even if you were in the market theory, even if you're Bisline himself sitting at his computer, if you download it one day and then you download it the next and it's the same image because stuff's not being produced, there's not an inexhaustible supply for you to download, you're going to quit doing it because it's the same image. I don't understand how it helps Bisline to say, I only looked at stuff once. He did it over and over and over again. He admitted he did that. He admitted he did it even after he knew that Limeware was a file-sharing program. As the court pointed out, he admitted he agreed to the enhancement for distribution. Now, it wasn't an enhancement for knowingly distributing something for pecuniary gain. It was the lowest kind of distribution. But, I mean, I think that that was the minimum that could have applied in light of his admission that he continued doing this conduct for over a year. He certainly knew what he was doing, and he was the one who was doing it, as the court pointed out, rather than the automatic downloading program that the court referenced in its sentencing rationale. It's clear that the court has thoroughly scrutinized the record, so if I could try to answer any other questions the court may have. Otherwise, the United States asks the court to vacate the sentence and to remand for resentencing before a different district judge. Okay. Thank you both for your arguments. The case will be submitted. You may adjourn court.